**John S. KIRBY, d/b/a Quik-Chek of Indiana and Quik-Chek, Inc., Plaintiffs-Appellants,**

v.

**P. R. MALLORY & CO., INC., Defendant-Appellee.**

No. 72-1779.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1973.

Decided Nov. 27, 1973.

William F. LeMond, Terrence P. Pehler, Indianapolis, Ind., for plaintiffs-appellants.

Thomas M. Scanlon and Herbert C. Snyder, Jr., Indianapolis, Ind., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, and FAIRCHILD and PELL, Circuit Judges.

CASTLE, Senior Circuit Judge.

Plaintiff John S. Kirby (doing business as Quik-Chek of Indiana and Quik-Chek, Inc.) appeals from an order granting summary judgment to Defendant P. R. Mallory & Co. in an action in which Kirby sought $500,000 for damages allegedly sustained by Mallory's violation of antitrust law. On this appeal, Kirby claims several sources of district court error: the determination that no violation of the Robinson-Patman Act occurred, the finding that Kirby's complaint failed to state a claim under section 3 of the Clayton Act, the denial of Kirby's motion for leave to amend his pleadings, the granting of Mallory's motion for summary judgment after its previous denial, and the finding that no genuine issue as to any material fact existed.

We find no error, and we affirm the order of the district court.

Kirby is a rack jobber of principally Eveready batteries. He wholesales batteries to retail stores for resale to consumers, and he also services the stores' battery display racks. Prior to 1968, Kirby's chief customer was the Hook Drug Co., the largest retail drug chain in Indiana, which represented about 50% of Kirby's business. Mallory, Eveready's primary competitor in the manufacture of batteries, had sought the Hook account for some years. It had been rebuffed by Hook, because Mallory offered sales without service. Kirby also refused Mallory's request to change Hook's battery inventory to Mallory. In late 1967 or early 1968, Hook altered its policy and decided to service its own battery display racks. Hook then requested Eveready, Mallory and Kirby to submit bids for only the sale of batteries. Hook accepted Mallory's offer. As set forth in a May 2, 1968 letter from Mallory's sales manager McKinley, to Roesch, Hook's vice president, Mallory's terms to Hook corresponded with its terms to Kirby, with three exceptions: Hook was given a cooperative advertising allowance of up to 7½% of Hook's net purchases from Mallory, payable on proof of actual expenditure; Hook was to be "tagged" in 62½% of Mallory's Indianapolis radio advertising per year; and Hook was to be paid the construc-

tion cost of battery display racks conforming to Hook's decors. While the agreement was effected on September 10, 1968, the cooperative advertising allowance aspect was terminated on December 31, 1968. Hook's net purchases during this period were $81,494, entitling it to a $6,100 allowance. Mallory offered the allowance to other direct-purchase retailers, but it excluded wholesalers like Kirby who did not sell to the public. Mallory tags its largest retailers (direct-buying retailers and wholesalers' customers) within the "Indianapolis advertising market." Mallory has not extended this offer to either its direct-purchase retailers outside the Indianapolis market or to Kirby's 125 retailers throughout the state. Mallory also furnishes battery display racks of various sizes and kinds to its customers, both direct-buying retailers and wholesalers.

I.

Kirby alleged in his complaint that Mallory contracted to sell its batteries to Hook "at prices below which products of like grade and quality" were sold to Kirby, a violation of Robinson-Patman Act § 2(a).[1] During discovery, it became evident that Mallory had offered identical price schedules and discounts to Hook and Kirby, and Kirby shifted the basis of his complaint to §§ 2(d) and 2(e) of the Act.[2] Specifically, Kirby

1. 38 Stat. 730, as amended, 49 Stat. 1526, 15 U.S.C. § 13, provides in pertinent part as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, de-

stroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . ."

2. 38 Stat. 730, as amended, 49 Stat. 1526, 1527, 15 U.S.C. §§ 13(d), 13(e), provide in full as follows:

(d) "[I]t shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by

argued that Mallory's cooperative advertising allowance was contrary to § 2(d) in that it was a payment to Hook as compensation for services furnished by Hook in connection with the offering for sale of Mallory's products not proportionally available to Kirby, a customer competing in the distribution of the product. Kirby also argued that the radio tagging and the display units were unlawful under § 2(e), which prohibits discrimination among purchasers (such as Kirby and Hook) of batteries bought for resale by contracting or contributing to the furnishing of services or facilities connected with the offering for sale of batteries on terms not accorded on a proportionally equal basis.

With respect to the cooperative advertising allowance, the question of liability depends on the applicability of § 2(d) to customers on different functional levels who compete in the distribution of Mallory's products. That issue was decided in F. T. C. v. Fred Meyer, Inc., 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), a case involving a direct-buying retailer who induced his suppliers to grant him promotional allowances not proportionally available to the suppliers' wholesale customers or the wholesalers' retail customers. The Federal Trade Commission found this practice violated the statutory language of § 2(d) that allowances be "available on proportionally equal terms to all other customers competing in the distribution of such products" and required that the suppliers' wholesale customers be granted proportional allowances. The Supreme Court held, however, that § 2(d) did not require proportional equality between Meyer, the direct-purchase retailer, and the wholesalers; rather, retailers purchasing from wholesalers are the suppliers'

"customers" for purposes of the Act and are entitled to proportionally the same allowance received by the competing direct-buying retailer. The Court responded to the Commission's interpretation of § 2(d):

> The Commission believed it found support for its position in the language of § 2(d) itself which requires that promotional allowances be accorded on proportionally equal terms to "customers competing in the *distribution*" of a supplier's product rather than merely to customers competing in resales. The majority reasoned that [the wholesalers], when they resold to Meyer's retail competitors, were competing with Meyer in the distribution of [the suppliers'] products because the two wholesalers were "seeking the same consumer dollars that respondents are after." 63 F.T.C., at [43]. While it cannot be doubted that Congress reasonably could have employed such a broad concept of competition in § 2(d), we do not believe that the use of the word "distribution" rather than "resale" is a clear indication that it did, and . . . the congressional hearings [indicate] that the section was meant to impose proportional equality only where buyers competed on the same functional level. 390 U.S. at 355–356, 88 S.Ct. at 912.

Thus, even though Kirby and Hook are customers competing in the distribution of Mallory products in an ultimate sense, Kirby cannot rely on the literal statutory language to assert liability, because Kirby, a wholesaler, and Hook, a direct-buying retailer, do not compete on the same functional level.

▮▮▮ Kirby replies that even if *Meyer* limits the scope of § 2(d) to cus-

---

such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

(e) "It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

tomers competing on the same functional level, Mallory is still liable because Hook is not only a direct-buying retailer but also a wholesaler, like Kirby. Kirby argues that when labels are disregarded, Hook's wholesaling nature is revealed by its performance of the following wholesaling functions: the chain buys directly from manufacturers, obtains a wholesaler's discount, warehouses the goods, distributes the goods to many outlets, and services the outlets' displays. We agree that a functional analysis is necessary to determine whether customers are in fact competing on the same distributive level. F. T. C. v. Simplicity Pattern Co., 360 U.S. 55, 62–63, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). However, even before the Robinson-Patman Act, it was well-settled that the litmus test of a wholesaler is the character of his selling, not his buying. Mennen Co. v. F. T. C., 262 U.S. 759, 43 S.Ct. 705, 67 L.Ed. 1219 (1923); see A. Neale, The Law of Anti-Trust in the U. S. A. 252–253 (2d ed., 1969). F. T. C. v. Rubberoid Co., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081, on which Kirby relies, supports this finding. *Rubberoid* holds that traders, whatever their designations, who compete at the same level must be granted the same discount. In looking through form to substance, the Court found that a Rubberoid customer who claimed to be an "applicator" (a contractor who uses the product himself) was in fact a wholesaler, because he resold the product to other applicators. Unlike both Rubberoid's applicator and Kirby, Hook is not reselling Mallory batteries to retailers; Hook sells solely to ultimate users. Hook's internal economies through the provision of services formerly performed by a wholesaler do not in themselves transform a retailer into a wholesaler. Since § 2(d) mandates proportional equality only between customers on the same functional level, we hold that Mallory was not required to grant the cooperative advertising allowance to Kirby.

■ Kirby next argues that even if *Meyer* limits the applicability of § 2(d) to customers competing at the same lev-el, this restriction does not apply to § 2(e), which protects "purchasers of a commodity bought for resale." As this language resembles that found in § 2(a) ("purchasers of commodities . . . sold for . . . resale") and as Congress intended to expand the meaning of competition in § 2(a) to include more than resellers operating on the same functional level, see F. T. C. v. Fred Meyer, Inc., *supra* at 355 of 390 U.S., at 912 of 88 S.Ct., the scope of § 2(e) must therefore be similarly expansive. Kirby's reliance on the disparities in statutory language fails to account for the coordinated nature of the two sections:

> Sections 2(d) and (e) of the Act deal with discrimination in the field of promotional services made available to purchasers who buy for resale. Where the seller pays the buyer to perform the service, Section 2(d) applies. Where the seller furnishes the service itself to the buyer, Section 2(e) applies. F. T. C. Guides for Advertising Allowances and Other Merchandising Payments and Services (1960).

Although the text of the two sections contains a spate of semantic variation, § 2(e) has long been viewed as coterminous with § 2(d), and courts have consistently resolved the two sections into an harmonious whole. 82 Harv.L.Rev. 63, 269–270 (1968); F. Rowe, Price Discrimination Under the Robinson-Patman Act 390 (1962); Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988, 992–993 (8th Cir., 1945), cert. den., 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945). For example, judicial interpretation has implied § 2(e)'s interstate commerce requirement into § 2(d). Decisions have not distinguished the "customers" of § 2(d) from the "purchasers" of § 2(e) and have considered allowances "available" and services "accorded" whenever openly offered to buyers. This court would therefore feel compelled to interpolate into § 2(e) the prerequisite of directly competing purchasers had this not previously been established by judicial doctrine. Elizabeth

Arden, Inc. v. F. T. C., 156 F.2d 132 (2d Cir. 1946), cert. den., 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828 (1947); F. T. C. v. Simplicity Pattern Co., *supra,* at 62–63 of 360 U.S., 79 S.Ct. 1005. This court has expressly held, "For [§ 2(e)] to be applicable, the favored customers must be competitors of the [disfavored] plaintiff." Centex-Winston Corp. v. Edward Hines Lumber Co., 447 F.2d 585, 588 (1971) (Cummings, J.). Section 2 (e) is therefore equally unavailing for Kirby. Since Kirby was not Hook's competitor, Mallory is not required to furnish Kirby with proportionately equal radio tagging or displays.

We carefully limit these findings to the facts of this case, recognizing, as did the Supreme Court in *Meyer,* that "it would be both inappropriate and unwise to attempt to formulate an all-embracing rule applying the elusive language of the section to every system of distribution." 390 U.S. at 357, 88 S.Ct. at 912. As in *Meyer,* the facts clearly indicate that the direct impact of competitive discrimination is felt by the retailers with whom Hook competes. Therefore, the most reasonable construction of the statute requires proportionally equal treatment only among those competing directly. *Id.*

■■■ Kirby further asserts that Mallory's discrimination in promotional payments and services represents indirect price discrimination, proscribed by § 2(a), irrespective of the favored and disfavored customers' positions in the distribution chain. This argument fails, however, to distinguish adequately between indirect price discrimination and disproportionate payments of services. This was clarified by New England Confectionery Co., 46 F.T.C. 1041 (1949), in which the Commission stressed that a seller's payments as well as services in connection with the *original* sale to the purchaser rather than with regard to the purchaser's subsequent *resale* were not cognizable under §§ 2(d) or 2(e) but were challengeable only under § 2(a) as indirect price discrimination. *See* Rowe, *supra,* at 107, American Can Co.

v. Russelville Canning Co., 191 F.2d 38, 56 (8th Cir. 1951). In the present case, it is apparent that the payments and services to Hook are provided not in connection with the original sale from Mallory to Hook but rather with respect to projected resales. The alleged violations in this case are properly exclusively subsumed under §§ 2(d) and 2(e), rather than § 2(a). Moreover, the theory that §§ 2(d) and 2(e) proscribe acts which are themselves prohibited by § 2(a) is not supported by either legislative history or the scheme of the Act. Senator Logan, the Senate floor manager of the bill, indicated that §§ 2(d) and 2(e) were devised to specifically cover a "second scheme" designed to evade the price discrimination outlawed in the original Clayton Act. 80 Cong.Rec. 6282 (1936). The Report of the House Judiciary Committee stated that the aims of the amendment were "to suppress more effectually discriminations between customers of the same seller, . . . sometimes effected directly in prices . . . and sometimes by separate allowances to favored customers . . ." H.R.Rep.No.2287, 74 Cong., 2d Sess. 7 (1936). Congress, noting the distinction between the two schemes, imposed stricter standards of legality respecting promotional discriminations than price discriminations. Price discrimination is lawful if it can be justified under several exculpatory provisos or has no effect on competition. In contrast, promotional discrimination is illegal per se, irrespective of competitive impact and without resort to statutory justification. *See,* Rowe, *supra,* at 372. Kirby's argument would have us collapse the distinction in schemes and standards and would have us find that the two sections are mere surplusage. This we decline to do. In view of the strict standards of §§ 2(d) and 2(e), which focus on resale, it appears quite clear that Congress carefully considered the deficiency in the original law proscribing price discrimination in the supplier-customer sale and drafted §§ 2(d) and 2(e) to apply exclusively to promo-

tional discriminations like those alleged in this case. *See,* Rowe, *supra,* at 362–376.

Finally, Kirby contends that Mallory's payments, tagging, and display units contravened the *Meyer* mandate of proportional equality with respect to Kirby's retailers, Hook's direct competitors. Kirby argues that as he was the principal victim of the promotional discrimination, he is entitled to damages. *See,* Perkins v. Standard Oil Co., 395 U. S. 642, 649, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). We find that the district judge properly concluded there was no violation of the Robinson-Patman Act with respect to the display units. Kirby stated he was known as a rack jobber of Eveready batteries who relied on Mallory primarily for hearing-aid and mercury batteries. He used other Mallory batteries only when Eveready batteries were unavailable to him. Kirby admitted that Mallory had furnished him with display racks for hearing-aid batteries and .eight-pin blister batteries, which Kirby had in fact given to his retailers. Mallory stated that as an inducement to Kirby to switch the inventory of Hook (prior to 1968), Mallory offered to supply Kirby for Hook's use with units comparable to those ultimately built for Hook (and supplied by Mallory to other large buyers, including wholesalers). Given the nature of Hook's and Kirby's respective purchases and the nature of the racks actually supplied to each of them, it was well within the province of the judge to find as a matter of law based on uncontested facts that the units furnished each of them were proportionally equal. *See generally,* Bond Distributing Co. v. Carling Brewing Co., 325 F.2d 158 (4th Cir. 1963); Gold Fuel

Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61 (3rd Cir. 1962), cert. den. 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963).[3]

It is uncontested that Mallory offered neither allowances nor advertising tagging for Kirby's retail customers. However, before a party protected by the Act can recover damages, he must prove both actual injury and causality between the violation and· the injury. Perkins v. Standard Oil Co., *supra,* at 648 of 395 U.S., 89 S.Ct. 1871; 31 Md. L.Rev. 60 (1971). We find the court below correctly determined on the basis of undisputed facts that Kirby suffered no general damages. Kirby admitted that neither he nor his retailers engaged in any advertising of Mallory batteries to offset the expenditure granted Hook. Kirby further admitted that he undertook no advertising resembling the tagging given Hook and that he had no knowledge of any similar activity ·on the part of his retailers. Kirby did state that for the purpose of offsetting the tagging, he hired a salesman, bought additional equipment, and sought other products for resale. It is obvious, however, that these expenses are unrelated to any injury suffered by Kirby's customers because of promotional discrimination. Rather, these costs result from Kirby's efforts to replace his Hook business, a cost not related to a legal wrong. The record further establishes that Kirby suffered no special damages. Kirby admitted that his retailers had not reported any sales lost to them because of Mallory's agreement with Hook. If Kirby's customers suffered no sales losses from the agreement, Kirby cannot tenably maintain that he suffered any loss of profit from Mallory's action. *Accord,*

---

3. In Interrogatory 35, Kirby was asked without specification of context if he had constructed or caused to be constructed for his customers' use, racks comparable to those furnished to Hook. He replied in the affirmative, without stating whether those racks were intended to hold Eveready or Mallory batteries. Because of our conclusion supporting the finding of the trial court that Mallory did not violate the Robinson-Patman Act with respect to the furnishing of display racks, we need not reach the question of whether Kirby's expenses for the construction of these racks were causally related to any action taken by Mallory.

**912**

State Wholesale Grocers v. The Great Atlantic & Pacific Tea Co., 202 F.Supp. 768, 775 (N.D.Ill.1961).

## II.

 Kirby asserts that the court below erroneously ignored the claim allegedly made in his complaint that Mallory had made an exclusive-dealing arrangement with Hook, unlawful under section 3 of the Clayton Act. Kirby apparently predicates this contention on the inclusion in his complaint of the following, "This action arises under the Clayton Act . . . as amended by the Robinson-Patman Act . . . as hereinafter more fully appears." Respecting sufficiency of the pleadings, the Federal Rules of Civil Procedure require only " 'a short and plain statement of the claim' that will give the defendant fair notice of what plaintiff's claim is and the grounds on which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). We find that a mere formal citation to the Clayton Act to focus attention on its amendment, the Robinson-Patman Act, does not provide sufficient notice to Mallory to answer or to prepare for trial on a Clayton Act exclusivity issue. Further, nothing in the statement of facts suggests a § 3 claim. The substance of the claim is, "Defendant has contracted to sell Defendant's products to said Hook Drug Co., Inc., at prices below which products of like grade and quality are sold to Plaintiffs. . . . The Defendant in selling batteries at such unreasonably low prices with the purpose and intent to destroy competition and to eliminate one or more competitors has violated 15 U.S.C.A. Section 15." It is clear that these circumstances relate to price discrimination proscribed by the Robinson-Patman Act (15 U.S.C. § 13) rather than exclusive-dealing, prohibited by the Clayton Act (15 U.S.C. § 14). We conclude that Kirby's original pleadings did not state a Clayton Act § 3 claim.

 Kirby next argues that the court erred in refusing to permit him to assert a Clayton Act § 3 claim. We note that the action was commenced on September 24, 1968, and on November 4, 1968, Kirby took Hook's Vice President Roesch's deposition. Attached to the deposition was the May 2, 1968 letter from McKinley to Roesch which Kirby contends establishes the exclusive-dealing. The grant of leave to amend pleadings is within the discretion of the trial court, Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1970), and the only question here is whether the court abused its discretion in denying Kirby's motion. See Tyne v. National Supply Co., 280 F.2d 878 (7th Cir. 1960). Kirby's motion was filed on October 4, 1971. It contained no facts unknown to him 2½ years prior to the motion. Yet Kirby did not seek to file his motion until Mallory's motion for summary judgment was reset for oral argument, when Kirby anticipated foreclosure of his Robinson-Patman claim. It is clearly unfair to Mallory to permit Kirby to remain mute for this period and then to bolster his pleadings to prevent an anticipated adverse judgment. Accord, Vine v. Beneficial Finance Co., Inc., 374 F.2d 627 (2d Cir. 1967), cert. den., 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); Fowler v. Sponge Products Corp., 246 F.2d 223 (1st Cir. 1957); Eisenmann v. Gould-National Batteries, Inc., 169 F.Supp. 862 (E.D.Pa.1958). Moreover, between November 1968 and October 1971, extensive pretrial procedure, necessary in antitrust cases to particularize issues of fact, was largely completed. It would be unjust to permit an untimely amendment, materially altering the basis of the action, necessitating additional discovery, conferences, and pre-trial orders and statements. Gaylord Shops, Inc. v. South Hills Shoppers' City, 33 F.R.D. 303 (W.D.Pa. 1963); see, 3 J. Moore, Federal Practice ¶ 15.08 [4]. We agree with Judge Major who stated, in finding no abuse of discretion in denial of a motion to amend where the plaintiff, like Kirby, was aware of the necessary facts two years prior to his motion and showed no reason for his delay, "All litigation must

sometime be brought to an end, and, in our view, under the circumstances, there was no abuse of discretion. . . ." Stanek v. Trailmobile, Inc., 283 F.2d 827, 829 (7th Cir. 1960); Boris v. Moore, 253 F.2d 523 (7th Cir. 1958).

## III.

 Kirby moved for summary judgment on July 14, 1969, and Mallory filed a motion for summary judgment on August 21, 1969. These motions were denied on January 18, 1971. Subsequently, on September 21, 1971, the court granted Mallory's motion for reconsideration of its motion for summary judgment. Kirby filed a motion for reconsideration on October 6, 1971. The court granted Mallory's motion for summary judgment on July 10, 1972. On appeal, Kirby asserts that the court below had no authority to reconsider its own decision, a position somewhat inconsistent with Kirby's motion for reconsideration to the trial court. The order of denial of summary judgment is an interlocutory decree, United States v. Florian, 312 U.S. 656, 61 S.Ct. 713, 85 L.Ed. 1105 (1941); Madry v. Sorel, 440 F.2d 1329 (5th Cir. 1971); Alart Associates, Inc. v. Aptaker, 402 F.2d 779 (2d Cir. 1968), without res judicata effect. 6 J. Moore, *supra*, at ¶ 56.14[2]. If good reason is shown why a prior denial of a motion for summary judgment is no longer applicable or should be departed from, the trial court may, in the exercise of sound discretionary power, consider a renewed motion for summary judgment, particularly when the renewed motion is based on an expanded record. Allstate Finance Corp. v. Zimmerman, 296 F.2d 797 (5th Cir. 1961); Brownfield v. Landon, 113 U.S.App.D.C. 248, 307 F.2d 389 (1962); Beedy v. Washington Water Power Co., 238 F.2d 123 (9th Cir. 1956); 6 J. Moore, *supra*. On the facts of this case, we find that the court below did not abuse its discretion in granting Mallory's motion for summary judgment after previously denying it. Subsequent to the denial, Kirby answered Mallory's interrogatories. These interrogatories plainly established that Kirby could not show damage either to himself or to his retailers either through loss of sales, out-of-pocket expenses or increased business costs causally related to Mallory's actions. Without a showing of damages, a private action under the Robinson-Patman Act cannot be maintained. The interests of efficient judicial administration compel the empowering of the court to reconsider motions for summary judgment when uncontested facts showing the absence of a necessary element for a prima facie case are revealed subsequent to the court's denial of the motion.

Pursuant to a local rule of the Southern District of Indiana, the court made explicit findings of fact appended to its order granting summary judgment. Kirby admits these facts are "for the most part correctly stated," but he contends that there are some genuine remaining issues of fact. We note that Kirby filed two affidavits: one focused on the Mallory-Hook agreement and stated that Kirby's damage was the loss of the Hook business; the other stated that because Mallory offered its batteries to Hook at wholesale prices, Kirby was unable to sell batteries to retailers at prices permitting them to compete with Hook and still make a profit. We determine that summary judgment was properly granted. It is immaterial that Mallory solicited Hook's business, a fact which Mallory admitted, since Mallory was acting lawfully in seeking sales. The question of the price at which Hook sold batteries to the public is also irrelevant to a promotional discrimination suit, and the court in its discretion need not have stated a finding respecting this price. The extent to which Kirby handled Eveready batteries appears uncontradicted and, in any event, is similarly immaterial to the case. There is no dispute as to the list prices and discounts offered Kirby and Hook, and Kirby's characterization of the cooperative advertising allowance as price discrimination is a legal, rather than factual issue for the court to decide. Mallory's reason for not offering the allowance to Kirby (that it was only offered to pur-

chasers selling directly to the public), is both undisputed and immaterial. Mallory admitted Kirby's claims that he did not receive an offer of tagging and that his customers did not receive tagging or allowances. It is uncontested that Mallory had racks costing $66.30 each constructed in Hook's stores and that Mallory supplied various kinds of racks to its distributors, including Kirby, depending on individual needs. Mallory had in fact offered Kirby racks comparable to those installed in Hook's stores when it requested Kirby to switch Hook's inventory from Eveready to Mallory. It is likewise uncontested that neither Kirby nor his customers engaged in any advertising of Mallory products. Finally, respecting the court's finding that the promotional discrimination did not result in any loss of Mallory battery sales by Kirby to his retail customers competing with Hook, Kirby stated that he had no knowledge of customers unable to sell batteries in competition with Hook and that he had no record of sales which he could not make to his retailers because of the Mallory-Hook agreement.

The order of the district court is affirmed.

Affirmed.