L. S. AMSTER & CO., INC. and Interstate Cigar Co., Inc., Plaintiffs,

v.

McNEIL LABORATORIES, INC., Defendant.

No. 76 Civ. 1214(MEL).

United States District Court, S. D. New York.

Dec. 30, 1980.

Patterson, Belknap, Webb & Tyler, New York City, for defendant; Thomas C. Morrison, Gene M. Bauer, Christine H. Miller, New York City, of counsel.

LASKER, District Judge.

. L. S. Amster & Co., Inc. (Amster) and Interstate Cigar Co., Inc. (Interstate). sue McNeil Laboratories, Inc. (McNeil) alleging that McNeil's enforcement of its advertising allowance program for its product Tylenol violated the Robinson-Patman Act, 15 U.S.C. §§ 13 *et seq.*, and the Sherman Act, 15 U.S.C. §§ 1 *et seq.* McNeil moves for summary judgment dismissing the complaint, and on its first counterclaim which alleges breach of contract. Plaintiffs cross-move for summary judgment on their claim that the granting of off-invoice allowances was discriminatory.

### I. The Advertising Allowance Program

Pursuant to its "Basic Advertising Agreement," McNeil sells Tylenol at a discount price to purchasers who agree to perform advertising services for the Tylenol purchased. The advertising is to be published within a specified time. To qualify for the allowance, participating purchasers must identify those retail stores which they "control" for advertising purposes, that is, those stores where the Tylenol will be available on a retail level while the advertising is running.

Prior to 1976, McNeil permitted purchasers to receive price reductions without requiring them to perform the advertising. In 1976, McNeil ran the so-called "Bell Ringer" promotion, under the terms of the Basic Advertising Agreement. On the last day of the promotion, Amster ordered 45,-000 dozen promotionally priced Tylenol. McNeil determined that amount to be in excess of Amster's advertising capabilities, and supplied Amster with a significantly reduced amount which McNeil believed Amster would be able to promote pursuant to the Basic Advertising Agreement.

Noel W. Hauser, P. C., New York City, for plaintiffs.

## II. The Plaintiffs' Contentions

Although the complaint alleges other claims than those set forth here,[1] plaintiffs' brief in response to this motion asserts the following five claims:

(1) By granting the advertising allowances to certain customers on an "off-invoice" basis (that is, by reducing the purchaser's bill instead of paying by separate check after receiving the purchase price), McNeil discriminated against those customers who did not receive allowances off-invoice.

(2) The advertising allowance program was not realistically available to all McNeil customers. Plaintiffs sold Tylenol nationally prior to the "Bell Ringer" promotion, but nevertheless were unable to meet the advertising requirements of the Basic Advertising Agreement on a nationwide basis.

(3) The advertising allowance program discriminates against indirect buying retailers and the wholesalers who supply them and in favor of direct-buying retailers.

(4) McNeil's advertising allowance program is a "vertically imposed scheme" intended to divide customers and territories, in violation of Section 1 of the Sherman Act.

(5) McNeil did not consistently enforce its program, but required advertising performance from only certain of its participating customers.

## III. McNeil's Position

McNeil argues (1) that the granting of off-invoice allowances effectively constitutes an extension of credit which is permitted under decided cases, (2) that the advertising allowance program was available to the plaintiffs who could have expanded their participation to meet the requirements of the program, (3) that McNeil may as a matter of law treat direct-buying retailers

differently from plaintiffs who are wholesalers, (4) that no limit on plaintiffs' market is imposed by the program because plaintiffs are free to advertise anywhere and thereby sell discounted Tylenol anywhere, and (5) that plaintiffs show no evidence of uneven enforcement of McNeil's program.

## IV. Discussion

### A. Off-Invoice Allowances

Plaintiffs argue that McNeil granted off-invoice allowances to certain favored customers and that McNeil failed to advise all its customers, including plaintiffs, that such an arrangement was available.

McNeil admits that its standard procedure was to pay allowances by separate check after proof of performance of advertising had been submitted, but that a few customers received their allowances off-invoice. However, McNeil argues that since it issued guidelines to its salesmen which explain how customers could qualify for this arrangement, its practice was legal by analogy to cases permitting the extension of credit to certain customers.

McNeil's analogy to the credit situation appears apt: plaintiffs' complaint as to the off-invoice allowance is not that the purchase price differs, but that the customer does not have to pay as much at the invoice stage, and consequently has more money on hand for a larger purchase, or may receive interest on the money not paid. While we therefore agree with McNeil that the credit extension cases are a good guide for determining whether selective off-invoice allowances violate the Act, nevertheless as appears below, we believe that McNeil reads these cases too broadly.

Turning to the credit cases, then, in *Diehl & Sons, Inc. v. International Harvester Company*, 426 F.Supp. 110 (E.D.N.Y.1976), a truck distributor and its subsidiary sued the

---

1. The claims alleged in the complaint but not pressed in plaintiffs' brief are (1) that the amount of advertising allowance bears no relationship to the cost of advertising (Counts II, V), (2) that Amster was coerced into signing the Basic Advertising Agreement (Count VII), and (3) that McNeil raised the price for Tylenol 10% effective August 23, 1976 and then reduced an order for Tylenol placed by Amster to a "miniscule" amount (Count IX). Since plaintiffs do not press these claims in their brief and fail to point to any evidence to support them, these claims appear to be abandoned and are accordingly dismissed.

truck manufacturer and the manufacturer's subsidiary (IHCC) which extended credit to finance truck sales, alleging assorted violations of the antitrust laws and the Dealer's Day in Court Act. On defendants' motion for summary judgment, the court held that as to the granting of more favorable credit terms to other truck distributors, no Robinson-Patman claim was stated against IHCC:

"Decisions affecting the granting or withholding of credit involve many factors of business judgment and consequently it has been uniformly held that discrimination in credit terms is outside the Act's coverage."

*Id.* at 122 (citations omitted).

A case relied on in *Diehl,* but not cited by McNeil, is *Craig v. Sun Oil Company of Pennsylvania,* 515 F.2d 221 (10th Cir. 1975). There plaintiff, a distributor franchised by Sun Oil, alleged that Sun Oil engaged in price discrimination by virtue of the credit terms available to him. The court affirmed the district court's conclusion that the differences between the credit terms given to plaintiff and those given to his predecessor did not constitute price discrimination.

"It is obvious that differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, and other devices used by creditors under these circumstances.... We do not say that there could not be a discrimination in credit of such magnitude or nature as to constitute a violation, but no such extreme situation was alleged here by any means."

*Id.* at 224 (citations omitted). It should be noted that in *Craig* the Tenth Circuit refused to foreclose the possibility that an extension of credit might constitute a violation of Robinson-Patman, but held that the complaint before it did not allege price discrimination.

Similarly, in *Carlo C. Gelardi Corp. v. Miller Brewing Company,* 421 F.Supp. 237 (D.N.J.1976), the court held that Miller's extension of credit to beer distributors other than the plaintiff did not constitute price discrimination.

"[C]ourts are very reluctant to find that credit differentials amount to violations of § 2(a).... Indeed, the plaintiff has not cited, nor has this Court been able to find, any case which has made such a finding.... Given the numerous business stresses which may affect credit terms, discrimination in credit terms must be of an extreme magnitude or nature before it can be the basis for a claim under § 2(a)."

*Id.* at 246 (citations omitted).

We believe that *Craig* and *Carlo C. Gelardi* correctly state the law on the subject. Although there appear to be no cases that have held that extension of credit to certain but not all customers violates the Robinson-Patman Act, and although those decided cases have invariably concluded that the decision not to extend credit to the plaintiff was based on business considerations and therefore not a Robinson-Patman violation, *Craig v. Sun Oil Company of Pennsylvania,* 515 F.2d 221, 224 (10th Cir. 1975); *Skinner v. United States Steel Corporation,* 233 F.2d 762, 764 (5th Cir. 1956); *Diehl & Sons, Inc. v. International Harvester Company,* 426 F.Supp. 110, 122 (E.D.N.Y.1976); *Carlo C. Gelardi Corp. v. Miller Brewing Company,* 421 F.Supp. 237, 246 (D.N.J.1976); *Lang's Bowlarama, Inc. v. AMF Incorporated,* 377 F.Supp. 405, 409 (D.R.I.1974); *Secatore's Inc. v. Esso Standard Oil Company,* 171 F.Supp. 665, 668 (D.Mass.1959) (construing section 13(e) which forbids discrimination in furnishing services or facilities), there does not appear to be any reason to conclude that the selective extension and denial of credit may never constitute a violation of the Act.

Nevertheless, McNeil has shown here that its decisions with respect to the granting of allowances on an off-invoice basis were determined by valid business considerations. The guidelines McNeil has issued to its sales personnel require essentially that before off-invoice allowances are granted, the customer must demonstrate compliance with the terms of past advertis-

ing allowance programs of McNeil (Defendant's Exhibit J). These guidelines are clearly related to McNeil's business purposes: they encourage compliance with the requirements of the advertising allowance program, and a demonstration of past compliance is a reasonable basis for concluding that the customer will comply in the future. In such circumstances, the granting of the allowance in advance is a reasonably safe method of generating good will among customers.

Moreover, plaintiffs have neither submitted nor suggested the existence of any evidence which demonstrates that McNeil's decision to grant or deny off-invoice allowances is based on any other motives than these business considerations. Under Rule 56(e) of the Federal Rules of Civil Procedure, plaintiffs "may not rest upon mere allegations ... but ... by affidavits or ... otherwise ... must set forth specific facts showing that there is a genuine issue for trial." *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). Since, as indicated above, a decision to extend credit which is based on valid business considerations does not violate Robinson-Patman, and since the only evidence of record establishes that McNeil's refusal to grant allowances on an off-invoice basis to plaintiffs was based on such considerations, McNeil is entitled to summary judgment in its favor on that portion of Count II of the complaint which challenges its system of granting extension of credit.

There remains, however, plaintiffs' claim that McNeil did not advise them of the availability of the off-invoice method of granting allowances. McNeil states in its brief that plaintiffs in fact knew about the off-invoice basis, as evidenced by their allegedly having asked for and been denied off-invoice allowances. On the other hand, plaintiffs submit the affidavit of Jerrold Herman, vice president of Amster and Interstate, which states that he was told that on the promotion in question, no off-invoice allowances would be granted to any cus-

tomer. Consequently, a question of fact is raised as to whether, as plaintiffs claim, McNeil deliberately withheld information regarding the availability of off-invoice allowances from plaintiffs while at the same time granting allowances on that basis to other customers, and on this limited issue summary judgment is denied.

**B.  The Availability of the Program to Plaintiffs**

The Basic Advertising Agreement requires the purchaser to identify the retail stores in which the Tylenol purchased will be available for retail sale at the time the advertising is running. Plaintiffs claim that the program was not realistically available to them because (1) although they sell Tylenol nationally, they did not advertise nationally and (2) they could not predict to which retail stores they would sell Tylenol, so they could not run the advertising for those stores nor identify them at the time they entered the Basic Advertising Agreement.

McNeil responds that the program was *in fact* available to plaintiffs since they did advertise for a group of stores in the New York metropolitan area, and that to increase their participation they needed only to supplement their advertising of Tylenol. Moreover, McNeil contends that an advertising program which "yields a more advantageous result to one customer than another" does not violate Robinson-Patman so long as it treats all customers equally.

For the reasons that follow, McNeil is entitled to summary judgment in its favor on the question whether its advertising allowance program was functionally available to plaintiffs. Plaintiffs claim that at the time they entered the agreement they could not identify the retail stores for which they would advertise. Plaintiffs do not appear to claim that they were unable to identify *any* stores, since they do not dispute that they were able to identify the LSA stores in the New York metropolitan area as retail stores for which they advertised. Rather, they claim that even though their market prior to the promotion was nationwide, they

were unable to take advantage of the promotion on a national scale because they cannot identify in advance those stores for which they advertise and to which they sell the Tylenol.

The authority cited by plaintiffs to support this contention are the FTC Guidelines on advertising allowances:

"§ 240.9  Availability to all competing customers.

(a) The plan should be such that all types of competing customers may participate. It should not be tailored to favor or discriminate against a particular customer or class of customers, but should in its terms be usable in a practical business sense by all competing customers. This may require offering all such customers more than one way to participate in the plan or offering alternative terms and conditions to customers for whom the basic plan is not usable and suitable. The seller should not either expressly, or by the way the plan operates, eliminate some competing customers, although he may offer alternative plans designed for different customer classes. If he offers alternative plans, all of the plans offered should provide the same proportionate equality and the seller should inform competing customers of the various alternative plans.

(b) With respect to promotional plans offered to retailers, the seller should insure that his plans or alternatives do not bar any competing retailer customers from participation whether they purchase directly from him or through a wholesaler or other intermediary.

(c) When a seller, in good faith, offers a basic plan, including alternatives, which is reasonably fair and nondiscriminatory, and refrains from taking any steps which would prevent any customer, or class of customers, from participating in his program, he shall be deemed to have satisfied his obligation to make his plan 'functionally available' to all customers, and the failure of any customer or customers to participate in the program shall not be deemed to place the seller in violation of the Act."

16 C.F.R. § 240.9.

Whatever ambiguity the regulations contain, it is clear that they do not appear to require that a plan allow all competing customers to participate *equally*. Instead, they prescribe only that the plan allow all customers to "participate." Plaintiffs do not contend that they were unable to participate at all.

Moreover, the case law suggests that McNeil is not required to ensure that each of its customers may participate to the fullest extent in the program. In *FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the Court held that the quantity discounts granted by Morton Salt constituted price discrimination.

"Theoretically, these discounts are equally available to all, but functionally they are not. For as the record indicates ... no single independent retail grocery store, and probably no single wholesaler, bought as many as 50,000 cases or as much as $50,000 worth of table salt in one year [the amount required to be purchased to receive the discount]. Furthermore, the record shows that, while certain purchasers were enjoying one or more of respondent's standard quantity discounts, some of their competitors made purchases in such small quantities that they could not qualify for any of respondent's discounts, even those based on carload shipments. The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price."

*Id.* at 42–43, 68 S.Ct. at 826. Thus, in *Morton Salt* the program was held illegal because there were customers who could not participate *at all*, and the decision does not mandate that every customer be permitted to participate to the same extent as every other customer.

In two recent cases, the courts addressed issues similar to the one raised here. In *Rod Baxter Imports, Inc. v. Saab-Scania of America, Inc.*, 489 F.Supp. 245 (D.Minn. 1980), the court held not to violate the Robinson-Patman Act an incentive program by which an automobile distributor awarded bonuses to dealers whose sales of a specified three month period exceeded by certain percentages their sales of the two prior three month period. The period chosen benefited some dealers more than others. Plaintiff claimed that its quota was too high because the three month period chosen coincided with its busy season. The court held the program valid because the bonus payments were available to all dealers on the same terms. Consequently, the fact that the program benefited some dealers more than others did not constitute a Robinson-Patman violation.

In *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243 (E.D.Pa.1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980), a Texaco gasoline wholesaler and distributor challenged Texaco's shifting of the site where the plaintiff picked up its gasoline to a place closer to the plaintiff's plant. This had the effect of decreasing the hauling allowance given by Texaco, because the hauling allowance was computed according to the distance between the distributor's plant and the site at which it picked up the gasoline. The district court held the practice not to violate the Robinson-Patman Act:

"Texaco is doing precisely what the Robinson-Patman Act says it should do: it is treating all its distributors equally. That such treatment yields a more advantageous result for one distributor than for another due to factors, such as the location of bulk plants and service stations, solely within each distributor's control cannot convert the practice into a

violation of the Robinson-Patman Act. As the Supreme Court has often reminded us, 'antitrust laws . . . were enacted for "the protection of *competition*, not *competitors*." ' "

*Id.* at 283 (quoting *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). On appeal, the Third Circuit affirmed, holding that neither the switch in plaintiff's pick-up site nor the hauling allowance formula itself violated the Robinson-Patman Act, even though the plan "produces differentials in the effective price of gasoline sold to Texaco distributors."

McNeil relies on *FLM Collision Parts, Inc. v. Ford Motor Company*, 543 F.2d 1019 (2d Cir. 1976). There, Ford's dual pricing system for automobile crash parts was challenged as a violation of the Robinson-Patman Act. Ford instituted an incentive allowance plan under which it granted its franchised dealers a discount on crash parts which they resold to independent automobile repair shops but not on the dealers' purchases for their own use or for resale to other types of customers, including FLM, a wholesaler of parts. The Second Circuit held that Ford's program was not discriminatory:

"The statute thus proclaims in substance that a seller must extend equality of treatment to its competing purchasers and may not discriminate in price between them. However, it does not prohibit the seller from offering different prices to each of its purchasers such as one price when he functions as a retailer and a lower price when he functions as a wholesaler, provided all competing purchasers are treated equally. In this case Ford, the seller, treated all of its purchasers (franchised dealers) equally, offering each the same prices as those offered to every one of its other dealers. Hence Ford's incentive payment plan did not discriminate against any of its purchasing dealers. All Ford dealers could receive the incentive payments resulting in lower

prices for parts they resold to independent repair shops, and all were denied these payments when the parts were not so resold. . . . In short, while the incentive payment plan did not set a single uniform price for all types of sales made by Ford to its dealers, it was administered with an even hand, without any discrimination among the dealers who purchased from Ford."

*Id.* at 1024–25. It is true that *FLM* does not clearly dictate the appropriate result here. The case does not address the issue of what constitutes "availability" of a plan. *FLM* did not raise the issue whether the program would be discriminatory if certain Ford dealers sold to more independent repair shops than other Ford dealers, and as a consequence were able to benefit more from the incentive program. Nevertheless, *FLM* does support McNeil's position, since the language quoted above may be interpreted as meaning that an incentive program is legal without regard to whether some purchasers are in a better position to take advantage of the program than others.[2]

In sum, the cases establish that the implementation of a discount or allowance program need not guarantee that all customers benefit to the same degree as other customers, as long as the program is evenly administered. Consequently, even assuming that plaintiffs were unable to participate to the same extent as they sold previously, since they were able to participate to a significant degree, the program was in fact functionally available to them.

The facts of record establish that Amster's ability to participate in the program was not de minimis. Amster does not dispute that it was able to identify the LSA stores as those for which it advertised. Amster's buyer, Jay Slade, testified during the preliminary injunction hearing that 10% of the products purchased by Amster are sold through those stores (Tr. 62–63). Consequently, plaintiffs claim that the reduction of their order according to the amount they sold through these stores limited their purchase to a "miniscule" amount is not persuasive. We need not decide what extent of participation is sufficient to render the program "available". Rather, we conclude only that the ability to participate up to 10% of its market is sufficient.

Accordingly, McNeil's motion for summary judgment on the claim alleged in Count III of the complaint that the program was not available to plaintiffs is granted.

## C. Discrimination Against Indirect-Buying Retailers

Plaintiffs claim that McNeil's program discriminates in favor of direct-buying retailers (the large chain drug stores who buy directly from McNeil) and against indirect-buying retailers (the small drug stores who buy from wholesalers) and the wholesalers who service them. Plaintiffs contend that direct-buying retailers can purchase large quantities of discounted Tylenol and due to their large warehouse facilities, have it available for retail sale at the time the advertising is running, as required under the Basic Advertising Agreement. After the promotion has concluded, these large chain stores are left with large amounts of

---

**2.** McNeil also cites *Interstate Cigar Co. v. Sterling Drug Inc.*, 79 Civ. 3547 (CBM) (S.D. N.Y. 1980), in which a program which gave a one-third discount to "new" purchasers of Haley's M–O ("new" purchasers were those who had never purchased the products before April 1, 1977 or had not purchased within the year preceding that date) was held not to violate the Robinson-Patman Act. The court found that there was a legitimate business justification of the program—to encourage new customers—and that the allowance "was equally available on identical terms and administered with an even hand to 'old' and 'new' purchasers," since those who were old customers could abstain from buying the product for a year to be able to benefit from the discount. Slip op. at 10. McNeil argues that if in those circumstances the discount was considered "available" to "old" customers, then certainly its advertising allowance program is "available" to plaintiffs here. However, even assuming that the program was in fact "available" to "old" and "new" purchasers, since the court found that it was not impossible for all purchasers to receive the discount, that case does not answer the question whether if it was impossible for plaintiffs to take advantage of McNeil's program nationally the program was not "available" to them.

cheap Tylenol which was not sold during the promotion. Indirect-buying retailers, on the other hand, do not have access to storage on the same scale. As a result, they lack the capacity to have large amounts of Tylenol available for retail sale at the time the advertising is running, and at the conclusion of the promotion do not have the advantage of ending up with large unsold amounts of cheap Tylenol. Moreover, the wholesalers who supply them, such as plaintiffs, cannot know in advance where the Tylenol will be available for retail sale, and consequently cannot take advantage of the program to the same extent as the direct-buying retailers.

McNeil responds that a seller is required only to treat equally those customers who compete at the same functional level, and need not treat wholesalers such as plaintiffs identically with direct-buying retailers.

In *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), the Supreme Court held that the Robinson-Patman Act reaches discrimination between customers who compete at the same functional level. In that case, Fred Meyer, a supermarket operator, instituted a promotional scheme whereby it distributed coupon books to customers containing coupons for products Meyer sold. The campaign was underwritten in part by Meyer's suppliers who paid $350. per page of advertising of their products, and gave Meyer price reductions on featured products. The FTC had concluded that this scheme violated section 2(d) of the Act which provides that allowances be "available on proportionally equal terms to all other customers competing in the distribution of such products" because the allowances given to Meyer by his suppliers was not available to the suppliers' wholesaler customers or the wholesalers' retail customers. The Court held that § 2(d) "reaches only discrimination between customers competing for resales at the same functional level and, therefore, does not mandate proportional equality between Meyer and the two wholesalers." *Id.* at 349, 88 S.Ct. at 908 (footnote omitted).

In *Kirby v. P. R. Mallory & Co., Inc.*, 489 F.2d 904 (7th Cir. 1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974), *Meyer* was applied to facts similar to those alleged here. There, a battery manufacturer offered advertising allowances, radio advertising "tagging", and the cost of constructing display racks to Hook, a large retail drug store, but did not offer those to Kirby, a battery rack jobber. The court held that this practice did not violate the Robinson-Patman Act because, under *Meyer*, "Kirby, a wholesaler, and Hook, a direct-buying retailer, do not compete on the same functional level." *Id.* at 908. The court rejected Kirby's contention that it was competing on the same level as Hook, who acted as a wholesaler by buying directly from the manufacturer, had a wholesaler's discount, warehoused the goods, distributed the goods to other outlets, and serviced those outlet displays. Instead the court found that Hook was functionally a retailer, because "the litmus test of a wholesaler is the character of his selling, not his buying." *Id.* at 909.

■ The lesson of *Meyer* (and *Kirby*) is that McNeil is required to treat equally with plaintiffs only wholesalers who buy *from* McNeil. Since the direct-buying retailers are not wholesalers under *Kirby*, even if McNeil's advertising allowance program did treat direct buying-retailers more favorably than plaintiffs, that would not be actionable.

■ As to the class of customers who compete at the same functional level with plaintiffs (that is, wholesalers), plaintiffs claimed in response to questioning at argument, that since McNeil "negotiates" the amount of discounted Tylenol its customers purchase, some customers have been permitted to purchase more discounted Tylenol than they, and thereby benefit from the program more than do plaintiffs. However, that McNeil negotiates the amount of discounted Tylenol its customers may purchase does not in itself violate the Act. The only "negotiation" shown occurs when McNeil's representatives discuss with its customers their ability to comply with the

terms of the Basic Advertising Agreement to determine the amount of discounted Tylenol they may purchase pursuant to those terms. (Deposition of George W. Spangler, regional manager of McNeil's Consumer Products Division, p. 43). Since plaintiffs have not shown that, for example, in such discussions McNeil applies different standards or considerations to one customer as opposed to another,[3] there is no evidence that the enforcement of the advertising allowance program discriminates in favor of any of its wholesaler customers, the class of customers with which plaintiffs functionally compete under *Meyer* and *Kirby*.

Accordingly, Amster is entitled to summary judgment in its favor on the claim alleged in Count III of the complaint that its advertising allowance program discriminates against plaintiffs.

#### D. Sherman Act

Plaintiffs claim that McNeil's enforcement of its advertising allowance program constitutes a vertically imposed restriction of their customers and territories in violation of section 1 of the Sherman Act. McNeil's withholding of discounted Tylenol, they claim, limits their market for Tylenol to those areas in which they advertise, that is, the New York metropolitan area.

McNeil responds that the program does not restrict where plaintiffs may sell discounted Tylenol. To sell nationally, plaintiffs need only advertise nationally.

McNeil's contention (that plaintiffs were not restricted in the amount of Tylenol they bought because they could have increased their advertising to buy more) depends on resolution of a factual issue not appropriately decided on this motion, since, as noted above, plaintiffs contend that they were not able to advertise nationally.

■ Nevertheless, McNeil is entitled to summary judgment in its favor on the Sherman Act claim. To prevail under section 1 of the Sherman Act, a plaintiff must

establish a "contract, combination ... or conspiracy in restraint of trade or commerce." As the Second Circuit stated in *Michelman v. Clark-Schwebel Fiber Glass Corporation*, 534 F.2d 1036, 1043 (2d Cir. 1976), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976), to meet this combination or agreement requirement, the evidence "must suggest a commitment to a common end." In *Michelman*, the court reversed the denial of the defendants' motions for a directed verdict and for judgment notwithstanding the verdict because of the lack of evidence to support an inference of a conspiracy to drive the plaintiff out of business. The court noted that section 1 of the Sherman Act " 'does not prohibit independent business actions and decisions.' " *Id.* at 1042 (quoting *Modern Home Institute Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102, 108 (2d Cir. 1975)). Recognizing that antitrust agreements are rarely evidenced by explicit agreements, the court stated:

> " '[T]he circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.' "

*Id.* at 1043 (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

■ Here, plaintiffs assert that McNeil's co-conspirators were all of the customers who signed the Basic Advertising Agreement. However, plaintiffs simply fail to produce any evidence that supports that claim. Instead, they rely on speculation that those who signed the agreement joined in McNeil's goal of imposing geographic restrictions on the Tylenol market. Since under Rule 56(e) plaintiffs must set forth evidence showing that there is a genuine issue of fact necessitating trial, this speculation is insufficient to withstand McNeil's motion for summary judgment.

---

**3.** Plaintiffs do contend that the program was selectively enforced against them. This claim is treated below.

Accordingly, McNeil's motion for summary judgment on the Sherman Act claim alleged in Counts VI and VIII of the complaint is granted.

### E. Selective Enforcement

Plaintiffs claim that McNeil did not uniformly enforce the advertising allowance program. They contend that McNeil required performance from them, but permitted other companies to receive the discounts without requiring them to perform the advertising.

Plaintiffs cite two instances in which they claim McNeil allowed other companies to receive discounts without performing the advertising. First, they rely on the deposition testimony of Lawrence DuBow, President of Lawrence Pharmaceuticals. DuBow testified that he had never seen the Basic Advertising Agreement and did not know the requirements of the program. (p. 41). This proves very little, since DuBow was not personally involved in the negotiations and dealings with McNeil. He identified Randy Groom as the employee who did supervise those transactions, and Groom testified during his deposition to the details of the program (pp. 15, 19–20, 26–27) and that Lawrence collected discounts only for sales to those stores for which Lawrence advertised. (p. 44).

■ Second, plaintiffs cite the fact that Stacy Williams & Co. purchased discounted Tylenol in excess of the amount it advertised for. McNeil contends that it did not know of this fact until it was revealed during discovery in this action, and when it did learn this, all advertising allowances to Stacy Williams were terminated. The only evidence cited by McNeil on this point is the deposition testimony of Carl Rogers, vice-president in charge of purchasing at Stacy Williams, who testified that their advertising allowances were terminated in February 1978 and that they have received no advertising allowances since. While this is certainly corroborative of McNeil's claim, it hardly proves that McNeil did not know of their failure to comply with the advertising agreement before it was revealed during discovery. Consequently, there is an issue of fact raised on this point that cannot be decided on the evidence submitted. That issue is whether McNeil knew of Stacy Williams' excessive buying during the promotions, and permitted that company to receive discounts without complying with the terms of the Basic Advertising Agreement, or whether it had no knowledge of that fact and corrected the situation as soon as McNeil learned of it.[4]

In sum, there appears to be one factual issue raised as to the claim that the program was selectively enforced, that is, whether McNeil knew prior to February 1978 that Stacy Williams Co. was receiving advertising allowances without performing the advertising required, and permitted that to continue.

### F. McNeil's Counterclaim for Breach of Contract

McNeil moves for summary judgment on its counterclaim for breach of the Basic Advertising Agreement signed by Amster on January 7, 1976. McNeil paid advertising allowances to Amster under that agree-

4. Plaintiffs also argue that proof of McNeil's uneven enforcement of its program is provided by the testimony of Roberta Harris, who at the time was McNeil's promotional payments manager. She stated that not all customers receiving advertising allowances had signed the Basic Advertising Agreement until the fall of 1976. (p. 53) Plaintiffs claim they were required to sign in March 1976 (it should be noted that the agreement is dated January 7, 1976, DX W). However, this statement of Roberta Harris is consistent with McNeil's position that the enforcement of the program could not become effective overnight, and required time to imple-

ment. Moreover, the statement hardly proves that McNeil selectively enforced its program, particularly when it is considered in light of the evidence submitted by McNeil which shows that McNeil attempted to administer its program evenly. That evidence includes the deposition testimony of McNeil executives as to the enforcement efforts of McNeil (Roberta Harris, pp. 46–51; William Lynch, pp. 141–44), intracompany memoranda which reflect those efforts and concerns that the program be fairly administered (PX H–K, N–O), and the forms used to effect those goals (PX P–Q).

ment, and Amster had stipulated that it does not claim that the advertising services were performed. McNeil states in its brief that counsel for both sides agreed that payment of this sum would await the outcome of this action.

Plaintiffs do not respond on this issue.

Since issues remain as to whether off-invoice allowances were available to plaintiffs and whether McNeil selectively enforced the advertising allowance program, decision on this issue is reserved until that claim is decided.

### V. Conclusion

McNeil's motion for summary judgment is granted except as to the claims of the unavailability of off-invoice allowances and selective enforcement, and the counterclaim for breach of contract. Plaintiffs' motion for summary judgment on the claim concerning the off-invoice allowances is denied.

It is so ordered.