## ALLGAIR v. GLENMORE DISTILLERIES CO., Inc., et al.

United States District Court
S. D. New York.

June 19, 1950.

Jay Leo Rothschild, New York City (Jay Leo Rothschild, Frank R. Cohen, New York City, of counsel), for plaintiff.

Breed, Abbott & Morgan, New York City (Gerald J. Craugh, New York City, of counsel), for defendant Glenmore Distilleries Co., Inc.

Spence, Hotchkiss, Parker & Duryee, New York City (Vincent J. Malone and Robert T. Tate, New York City, of counsel), for defendant New England Wine & Liquor Co., Inc.

Isadore Illman, New York City, for defendant Conway Co., Inc.

IRVING R. KAUFMAN, District Judge.

The defendants Glenmore Distilleries Company, Inc. (hereafter called "Glenmore"), New England Wine & Liquor Co. Inc. (hereafter called "New England") and Conway Company, Inc. (hereafter called "Conway") have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. The Conway Liquor Co. Inc. in the title of this action appears to be a misnomer for the Conway Co. Inc.

The complaint alleges that plaintiff is a distributor of liquors in New Jersey; that between October 1, 1946 and March 17, 1949 plaintiff paid Glenmore more than $150,000 as the purchase price for liquors sold to plaintiff; that all of the defendants were engaged in a combination and conspiracy to receive extra compensation, other than for services, supplementing the purchase price; that the scheme was worked out as follows: Glenmore offered the liquor to the plaintiff on condition that plaintiff pay additional compensation to Glenmore's designees; that Glenmore designated New England and Conway as the companies to which plaintiff was required to pay the extra compensation described as a "participation"; that plaintiff paid said extra purchase price in advance on September 12, 1946 amounting to $13,800; that payment of part of said extra purchase price was accomplished through the delivery of a check made out to Conway Liquor Co. Inc. and endorsed to Conway and American Beverage Co.

The action is for treble damages and is based on Sections 2(c) and 4 of the Clayton Act, the plaintiff contending that he was injured in his business by reason of the unlawful receiving of added compensation by the defendants in connection with a sale of goods in interstate commerce.

Section 2(c) of the Clayton Act, added by Section 1(c) of the Robinson-Patman Act, 15 U.S.C.A. § 13(c) reads as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein

where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control of any party to such transaction other than the person by whom such compensation is so granted or paid."

Section 4 of the Clayton Act, 15 U.S.C.A. § 15 provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Defendant Glenmore is engaged in the business of distilling, selling and distributing whiskey. New England and Conway are wholesale liquor dealers. It is admitted that Glenmore made the alleged sales to plaintiff and that in connection with the sales participation payments were made by plaintiff to New England and American Beverage Co., which was substituted for Conway in the transaction. The defendants contend however that there was nothing illegal about the transaction but that New England and American were paid for giving up valuable rights to the liquor which they agreed should be turned over to the plaintiff. Therefore they ask that summary judgment be granted in their favor.

The defendants say further, that even assuming the transaction to be illegal under Section 13(c) of Title 15 U.S.C.A., plaintiff, in paying the "other compensation" was himself a violator of Section 13(c) and therefore in pari delicto with the defendants; that this would preclude recovery of damages under Section 15 of Title 15 U.S. C.A.

This contention must be considered at the outset, for if defendants are correct, then the plaintiff's action must be dismissed. Neither party disputes the fact that one cannot recover on an illegal transaction to which he is a party and also in pari delicto.

It is obvious that the literal terms of Section 13(c) make it unlawful for any person to *pay* other compensation, as well as to receive such compensation, and that therefore plaintiff upon his own allegations and admissions is at least a technical violator of Section 13(c). See 80 Cong.Rec. 3115, March 3, 1936; House Report No. 2287, 74th Cong. 2d Sess. (Mar. 31, 1936); House Report No. 2951, 74th Cong. 2d Sess. (June 8, 1936).

The defendants contend that the plaintiff, as well as any person who pays a rebate, commission or other form of brokerage, no matter what the reason for such payments nor the damage to the one making the payments, is thereby automatically precluded from recovering under Section 15, supra. The exact question has not heretofore been considered by any court. This Court, however, after deep consideration is constrained to disagree with the defendants' theory.

The reasoning behind the decision of the Court of Appeals for this Circuit in the case of Ring v. Spina, 1945, 2 Cir., 148 F.2d 647, 160 A.L.R. 371, compels this conclusion. Plaintiff in that action was a theatrical production investor who signed a so-called "Minimum Basic Agreement" with The Dramatists' Guild as a prerequisite to entering into a contract with the authors of the play that he was to produce. A disagreement subsequently arose and the show closed. Plaintiff sued the authors and the Guild for treble damages under Section 15 on the ground that the Agreement that he had been required to sign was an illegal agreement under the Sherman Act. The district court had denied plaintiff's motion for a temporary injunction pending trial, and one of the grounds for this denial was its belief that plaintiff's participation in any possible combination, as evidenced by his signing the Basic Agreement, was sufficient to require denial of relief. The Court of Appeals overruled this view stating:

"* * * he (plaintiff) had to sign to save his $50,000 investment and to safeguard his further attempts to bring the venture to fruition. *This seems to us a*

*prima facie showing of economic coercion.* * * *

"It is well settled that where one party to an illegal contract acts under the duress of another the parties are not in pari delicto. * * * And in actions for triple damages under the Sherman Act a showing of economic duress similar to that asserted here has been held sufficient proof that the plaintiff is not a party to the monopoly. * * *

"Where the parties stand actually in pari delicto, the law should leave them where it finds them. * * * But here even without a showing of economic coercion as the final step in forcing him to sign the Basic Agreement, plaintiff is precisely the type of individual whom the Sherman Act seeks to protect from combinations fashioned by others and offered to such individual as the only feasible method by which he may do business. *Considerations of public policy demand court intervention in behalf of such a person, even if technically he could be considered in pari delicto. Indeed, this is a general principle applicable beyond the anti-trust field.* * * * Any other conclusion would mean that for many, perhaps most, victims of restraint of trade, private remedies under the Sherman Act would be illusory, if not quite non-existent." (Emphasis added) 148 F.2d at pages 647–653, 160 A.L.R. 371.

The test laid down by the Court, then, in determining the right to bring suit in these cases is not whether the plaintiff is or is not a technical violator, but whether he was economically coerced into violating the law and therefore not in pari delicto with those against whom the laws were designed to afford protection. This is sound law for to do otherwise would be to make a blind application of law work to the deprivation of those for whose benefit it was intended.

▆ Section 13(c) is applicable to both buyers and sellers, and to both payments and receipts of added compensation. This Court is of the opinion that those who *receive* the added compensation, whether buyers or sellers, should be absolutely barred from bringing suit for damages under Sec-

tion 15. However, those who pay the added compensation or rebates, whether buyers or sellers, are in a different category. There can be varying degrees of guilt in the category of those who pay the added compensation—some may voluntarily pay commissions in order to obtain a secret gain, whereas others may be forced economically to pay the rebates in order to stay in business.

It is the former type of payments that is truly reprehensible and should bar the payor from bringing suit for a violation of Section 13(c). Illustrative of a payment of this nature was that before the Court in the case of Kentucky-Tennessee Light & Power Co. v. Nashville Coal Co. et al., D.C.W.D.Ky.1941, 37 F.Supp. 728, affirmed sub nom Fitch v. Kentucky-Tennessee Light & Power Co., 6 Cir., 1943, 136 F.2d 12, 149 A.L.R. 650. In that action secret commissions had been paid by a coal company through its president to the president of the plaintiff corporation. The payments were voluntarily made in order to induce certain purchases made by plaintiff from the coal company. The coal company was under no compulsion to pay the commission and clearly benefited from the transaction since it obtained an advantageous position over its competitors and profited thereby. Therefore it was in pari delicto with plaintiff's president who received the secret brokerage and had the coal company been the plaintiff in a suit to recover the commissions, it could not possibly have recovered. The action that was brought in that case, and successfully so, was by the corporation taken advantage of against its own president as well as against the coal company and its president.

In connection with defendant's contention that even a technical violator of Section 13(c) should be barred from any remedy in the courts, it should be noted that the application of the doctrine of "in pari delicto" cannot even be considered until one has entered into an illegal transaction. An acceptance of the defendants' contention would in effect be a nullification of that doctrine.

The legislative history of Section 13(c) indicates that the Section was directed

primarily at the practice of large buyers demanding the allowance of brokerage directly to them upon their purchases. House Report No. 2287, supra. While the Section does make unlawful payment as well as receipt of commissions and rebates, often it is only the person who pays the commission and not a third party, who is injured because of such payment and the only one who could possibly have a cause of action under Section 15. To automatically exclude all those paying commissions from bringing suit would mean that for many victims of economic coercion "private remedies * * * would be illusory, if not quite non-existent." Ring v. Spina, supra, 148 F.2d at page 653, 160 A.L.R. 371. The Court does not believe that *all* payors of commissions in violation of Section 13(c) should be arbitrarily barred from bringing suit under Section 15.

The defendants attempt to distinguish the Ring v. Spina case, which appears to this Court to be indistinguishable in its rationale, on the ground that in that case the producer had invested $50,000 in the production before he even learned that such a thing as the Minimum Basic Agreement existed, and that therefore the producer had to enter into the conspiracy in restraint of trade in order to save his investment. This is but another way of saying that the producer in that case was under severe economic coercion which required him to violate the Sherman Act. Furthermore, it appears from the Ring case that the producer *was* indeed aware of the Basic Agreement at the time he invested the $50,000. This contention of the defendants seems to be directed merely at the extent of economic coercion existent in this case. Plaintiff asserts, quite in accord with the rationale of the Ring case, that he had to purchase liquor or lose his well-established business; that he reluctantly submitted to the conditions imposed by the defendants in order to continue his operations.

■ The Court cannot determine merely from the affidavits submitted the extent to which plaintiff may have been economically coerced into violating Section 13(c) or the extent to which he was in pari delicto with the defendants, if it should be

determined that plaintiff and the defendants did violate Section 13(c). This determination would have to be made at the trial of the action. The Court does believe that it will require a strong showing of economic coercion to permit suit under Section 15 by one who has made a payment in violation of Section 13(c). The extraordinary remedy of triple damages granted by Section 15 requires the closest scrutiny of the transaction which is the subject of suit, and suit should be allowed only in the rarest of cases where the party bringing suit is a commercial enterpriser rather than an innocent consumer, who is often given special protection by the law, e. g. Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq.; Housing & Rent Act of 1947, 50 U.S.C.A. Appendix, § 1881 et seq.

■ Plaintiff's right, then, to bring suit at all under Section 13(c) must be left for the trial court's determination. The defendants contend that assuming plaintiff has a right to bring suit, that there are no disputed facts and that on the facts they did not violate 13(c) and therefore are entitled to summary judgment. The Court does not believe that the facts are undisputed. The parties differ as to the nature of the relationship between Glenmore and the other defendants. If plaintiff's allegations are assumed to be true, New England and American (substituting for Conway) would be designees of Glenmore to whom extra compensation was paid, and the defendants would be subject to suit under 13(c). The defendants deny plaintiff's allegations. How then can there be no facts in dispute? Judge Leibell, in denying a motion to dismiss for lack of jurisdiction over their persons made by the defendants New England and Conway, said: "There is a question raised as to whether Glenmore acted as an agent for the two moving defendants in the transactions that gave rise to this suit. There is also a question raised as to the transactions themselves, where they were initiated and carried out, by whom and for whom, and whether they were sales of merchandise by the said two defendants, New England and Conway, or so-called 'participations' by them in plain-

tiff's wholesale profit. These questions are also involved in the merits of the controversy itself."

The questions raised in the above quotation have not been adequately answered by the affidavits submitted upon the defendants' motions. Therefore their motions for summary judgment must be denied. See Colby v. Klune, 2 Cir., 1950, 178 F.2d 872.

One further point must be noted. Plaintiff in its initial affidavit and brief suggested that the whole transaction was an attempt to evade the O. P. A. Regulations, especially Maximum Price Regulation No. 445. This allegation was rapidly withdrawn by plaintiff upon defendants' showing that if the Regulation was violated, plaintiff, as one engaged in the course of business in the transaction in question, would probably be barred from bringing suit under Section 13(c) because of pertinent sections of the Regulation and the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, §§ 904(a), 925 (e). Plaintiff now says that "the system which the defendants developed was created by ingenious minds, fully cognizant of the limitations of the O. P. A. statute, and inspired with a purpose to avoid it * * *", and that the plaintiff gives "them and their advisers credit for a concerted well-considered, carefully thought-out, and skillfully executed plan, which resulted in avoiding the O.P.A. statute, but, unfortunately, by the same standard, ran head on into the Robinson-Patman Act." Plaintiff thus graciously concedes legality to a very questionable transaction.

It is doubtful whether plaintiff can take the question of a possible violation of the O. P. A. statutes and regulations out of this case. If plaintiff establishes his own violation of O. P. A. Regulation No. 445 in proving both his and defendants' violation of Section 13(c), grave doubt will exist as to his right to recover. This question must however also be left for the trial court.

Motions by defendants Glenmore, Conway and New England for summary judgment denied.