HOWELL INDUSTRIES, INC., a
Michigan corporation, Plaintiff,

v.

SHARON STEEL CORPORATION, a
Pennsylvania corporation, Defendant.

Civ. A. No. 75–70319.

United States District Court,
E. D. Michigan, S. D.

Dec. 31, 1981.

Norman Hyman, Detroit, Mich., for plaintiff.

Robert Cutler, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ON ROBINSON–PATMAN CLAIMS

PATRICIA J. BOYLE, District Judge.

Before the Court are two motions by Defendant seeking summary judgment

with respect to some of Plaintiff's antitrust allegations under the Robinson-Patman amendments to the Clayton Act ("Act"), 15 U.S.C. § 13. Defendant contends here that the allegations of Count VII of the Complaint, found in Plaintiff's "Amendments to Plaintiff's First Amended Complaint" filed in 1976, do not raise actionable antitrust claims under subsections 2(a), 2(c), 2(d), 2(e), and 2(f) of the Act. The parties have agreed that no violation of subsection 2(f) is raised, and thus the Court addresses only allegations under the remaining subsections.

The Complaint as amended does not refer to specific subsections of the Act. Plaintiff alleges both direct and indirect "price and related discrimination" relating to resale resulting in a competitive injury to Plaintiff, and sets forth a nonexhaustive list of acts complained of:

(a) Defendant sold steel to its subsidiary at a price lower than that charged to Plaintiff;

(b) Defendant provided discounts and services to its subsidiary which were not provided to Plaintiff;

(c) Defendant sold steel to Plaintiff's customers and competitors with discounts and services not provided to Plaintiff;

(d) Defendant provided Plaintiff's customers and competitors with discounts and services not provided to Plaintiff.

Defendant contends here that, even assuming it sold steel to its subsidiary on terms more favorable than those extended to Plaintiff and that it did prefer customers other than Plaintiff in allocation and delivery of steel, Plaintiff's claims of price differentials, preferential allocation and delivery and illegal brokerages fail as a matter of law. Each will be discussed in turn.

*1. Price Differentials*

■ In Paragraph 50(a) of its Amendments to Complaint, Plaintiff alleges Defendant violated Robinson-Patman by having charged Plaintiff a higher price for steel than it charged its wholly-owned subsidiary, Ohio Metal Processing Company (OMPC). Defendant's original motion for partial summary judgment, filed in 1980, contended that no liability could attach for transactions between Defendant and OMPC for the reason that Section 2(c), which concerns price differentials that lessen competition, does not apply to transfers by a parent corporation and a wholly-owned subsidiary. The statute requires a sale to a favored buyer, at a low price, and a sale to a disfavored buyer, at a higher price. Defendant contended that transfers between a parent and subsidiary are not, as a matter of law, "sales" within the meaning of the statute, thereby eliminating any claim that Sharon discriminated in sale price in favor of OMPC and against Howell.

Plaintiff responded by citing caselaw suggesting that a *per se* rule is inappropriate, requiring instead an examination of the extent of control exercised over the subsidiary by the parent. Plaintiff argued that the motion was premature, no such inquiry having been made in the case as yet and the facts being insufficient to support the conclusion that OMPC was not independent of its parent corporation. Following the filing of the original briefs in the motion, however, and upon further discovery, Plaintiff has agreed that the facts here indicate that Sharon and OMPC are "one person" for purposes of Robinson-Patman analysis. Plaintiff's Supplemental Brief of October 8, 1981, at n.1. The factual question having been eliminated, therefore, there is no serious dispute between the parties that where a parent and subsidiary are "one person," the requisite "sale" cannot be found in transfers between the two entities. *See Security Tire & Rubber Co. v. Gates Rubber Co.,* 598 F.2d 962 (5th Cir.), *cert. denied,* 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979); *Parrish v. Cox,* 586 F.2d 9 (6th Cir. 1978); *Brown v. Hansen Publications, Inc.,* 556 F.2d 969 (9th Cir. 1977); *Brewer v. Uniroyal, Inc.,* 498 F.2d 973, 977 n.2 (6th Cir. 1974).

Accordingly, the Court concludes that Plaintiff's claim of price discrimination through more favorable prices to OMPC

than those extended to Howell does not state a claim under Section 2(a), and Defendant's motion with respect to that claim is hereby GRANTED.

### 2. Preferential Allocation and Delivery

■ In response to interrogatories propounded by Defendant, Plaintiff stated that the phrases "indirect discrimination" and "other services" in the Complaint as amended included preferential allocation and delivery of steel by Defendant. In its briefs and argument in connection with these motions, however, Plaintiff has abandoned any claim of preferential allocation of steel, relying solely on an allegation of preferential delivery to customers and competitors of Plaintiff, thus making consideration by this Court of allocation claims unnecessary.

Plaintiff contends that Defendant Sharon, in delivering steel to Plaintiff in accordance with the requirements contract agreed upon by the parties, did not make timely deliveries. Because the market price for steel was rising at the time in question, and because Defendant charged Plaintiff the price applicable on the actual delivery date rather than that applicable on the promised delivery date, Plaintiff Howell paid a higher price for steel than it would have had the delivery been timely and had it been billed as of that earlier date. Plaintiff contends that other customers of Sharon were preferred by being afforded timely deliveries and by being charged the price applicable on the promised delivery date. *See* Affidavit of Herbert Freedland, filed June 19, 1980.

Defendant contends here, assuming for the purpose of the motion it did prefer other customers in its steel deliveries, that such preferential delivery does not state a cause of action under sections 2(d) or 2(e) of the Robinson-Patman Act. Urging that the act be narrowly construed, Defendant argues that these two subsections prohibit only discriminatory practices relating to *resale*, an element not alleged by Plaintiff, and that the subsections have been construed to exclude claims of preferential allocation and delivery. Plaintiff responds by

arguing that delivery by a seller is a "service" within the meaning of subsections 2(d) and 2(e) and that, in addition, the claims of preferential delivery sound under subsection 2(a) for the reason that the alleged late delivery by the seller affected the price of the steel upon resale.

An examination of the legislative history and of subsequent judicial interpretation of sections 2(d) and 2(e) reveals that the primary purpose of those provisions was to preclude the granting or demanding of special allowances and collateral privileges that have the effect of price discrimination by virtue of selective application. In its report on the Robinson-Patman amendments, the House Committee on the Judiciary stated that the law was intended to stem not only direct price discrimination but also "advertising and other service allowances unless such allowances are made available to all purchasers on proportionally equal terms." H.R.Rep.No.2287, 74th Cong., 2d Sess. 3 (1936) [hereinafter "House Report"]. Discussing what is now subsection 2(d), the Report stated:

> Still another favored medium for the granting of oppressive discriminations is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in purported payment of advertising and other sales-promotional services, which the customer agrees to render with reference to the seller's products .... Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when in any case the customer is deriving from it equal benefit to his own business and is thus enabled to shift to his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so.

> Sections (c) and (d) of this bill address this evil by prohibiting the granting of such allowances, ... except when accorded or made available to all competing customers on proportionally equal terms.

*Id.* 15–16. In defining the term "proportionally equal terms," the Committee used an example of the granting to a chain distributor of "an advertising allowance of a stated amount per month per store," and later in the report added the caveat that the bill was not intended to limit the industry practice of manufacturers renting exhibit space at trade association exhibitions, "or for advertising space in trade-association publications, nor to limit the freedom of newspaper or periodical advertising generally so long as not employed in ways calculated to defeat the purposes of this bill." *Id.* 16.

Courts that have construed section 2(d) and 2(e) have noted the sections' focus on merchandising or promotional allowances, whether through advertising or related services, and have, with few departures, confined the application of the statute to that context. *See, e.g., FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); *FTC v. Simplicity Pattern Co.,* 360 U.S. 55, 69–70, 79 S.Ct. 1005, 1013–1014, 3 L.Ed.2d 1079 (1959); *Kirby v. P. R. Mallory & Co.,* 489 F.2d 904, 910 (7th Cir. 1973); *Southgate Brokerage Co. v. FTC,* 150 F.2d 607, 611 (4th Cir. 1945); *Ben B. Schwartz & Sons, Inc. v. Sunkist Growers, Inc.,* 203 F.Supp. 92, 99 (E.D.Mich.1962). *See also Corn Products Co. v. FTC,* 324 U.S. 726, 744, 65 S.Ct. 961, 970, 89 L.Ed. 1320 (1945). In addition, the regulations issued under the statute define "services or facilities" by setting out a list of examples but state that "the Act covers many other services and facilities." 16 C.F.R. § 240.5 (1980). That list of examples is confined to advertising, promotional, and merchandising arrangements, and acceptance of returns for credit. Plaintiff contends here that the regulation, by its explicit caveat, does not foreclose application of the Act to preferential delivery of goods. The listing is entirely consistent, however, with the interpretation of the statute by courts and commentators that preferential delivery, apart from freight charges, is beyond the intended reach of Sections 2(d) and 2(e). *See* F. Rowe, Price Discrimination Under the Robinson-Patman Act 380 (1962). Courts have rejected attempts to apply that subsection of the statute to preferential extensions of credit, *e.g., Craig v. Sun Oil Co.,* 515 F.2d 221 (10th Cir. 1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976), refusals to deal, *e.g., Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 594 F.2d 1313 (9th Cir. 1979); *Ben B. Schwartz & Sons, supra; but see Allen Pen Co. v. Springfield Photo Mount Co.,* 653 F.2d 17 (1st Cir. 1981), payroll deductions for employee purchases, *Skinner v. United States Steel Corp.,* 233 F.2d 762 (5th Cir. 1956); *but see K. S. Corp. v. Chemstrand Corp.,* 203 F.Supp. 320 (S.D.N.Y.1962), and preferential allocations, *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 502 F.Supp. 637 (D.N.J.1980). The majority of courts confronting the question have held that allegations of preferential delivery of products do not come within Section 2(d) or 2(e), for the reason that delivery, apart from freight charges and similar costs, does not constitute a service or facility furnished in connection with the processing, handling, sale or offering for sale of a product. *See David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *ACS Enterprises, Inc. v. Sylvania Commercial Electronics,* 1979–2 Trade Cas. ¶ 62,765 (E.D.Pa. 1979) (holding preferential delivery excluded from reach of Sections 2(e) and 2(a)); *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110, 123 (E.D.N.Y.1976); *Buchanen v. Yamaha International Corp.,* 1977–1 Trade Cas. ¶ 61,245 (D.Oregon 1976); *Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819 (M.D.Tenn.1974). Commentators are in accord with this narrower interpretation of Section 2(d). *See e.g.,* F. Rowe, Price Discrimination Under the Robinson-Patman Act 380–81 (1962):

Thus, while Section 2(d) or 2(e)'s literal text is susceptible to extension beyond the area of promotional arrangements related to the customer's resale of the supplier's product, decisions of the Federal Trade Commission and the courts have repudiated such strained applications and confined these provisions to their legislatively contemplated province.

The case heavily relied upon by Plaintiff, *Centex-Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972), does support Plaintiff's contention that discriminatory delivery practices can constitute a violation of Robinson-Patman. *Centex* has received some approval by other courts, *see Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 371 F.Supp. 701, 710 (S.D.N.Y.1974), *aff'd on other grounds*, 493 F.2d 1352 (2d Cir. 1974) (subsection 2(e) "deals with discrimination in delivery services"); *Palmer News, Inc. v. ARA Services, Inc.*, 476 F.Supp. 1176, 1183–84 (D. Kansas 1979); *Glowacki v. Borden, Inc.*, 420 F.Supp. 348, 356 (N.D.Ill.1976), while other courts have avoided passing on the *Centex* rule, *see Purdy Mobile Homes, Inc. v. Champion Home Builders Co.*, 594 F.2d 1313 (9th Cir. 1979), including a panel of the Seventh Circuit, *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 617 F.2d 468, 472–73 (7th Cir. 1980). Several courts have expressly rejected the *Centex* holding, *see David R. McGeorge Car Co., supra*, 504 F.2d at 54–55; *Cecil Corley Motor Co., supra*, 380 F.Supp. at 851–52; *Buchanen v. Yamaha International Corp., supra.* *See also Dobbins v. Kawasaki Motors Corp.*, 362 F.Supp. 54, 60–61 (D. Oregon 1973) (plaintiff's claim that supplying of motorcycles is a service within Section 2(e) is a "novel theory"). The vitality of the *Centex* holding would appear to be in serious question in light of its dissonance with the accepted scope of the statute and in view of the Seventh Circuit's subsequent decision in *Kirby v. P. R. Mallory & Co.*, 489 F.2d 904 (7th Cir. 1973). In *Kirby*, pointed to by some as a repudiation of the *Centex* reasoning, the Seventh Circuit construed Sections 2(d) and 2(e) to apply to instances of promotional discrimination on resale, 489 F.2d at 910, with language that at a minimum throws doubt on the *Centex* rule. *See also Harper Plastics, supra*, 617 F.2d at 472–73.

The cases cited by Plaintiff as support for its argument that preferences in delivery constitute a violation of Robinson-Patman involve not differences in time of delivery but discrimination in *charges* relating to freight or delivery, consequently resulting in price discrimination far less attenuated than that alleged here. *See Corn Products Refining Corp. v. FTC*, 144 F.2d 211, 214–16 (7th Cir. 1944), *aff'd*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945); *Re Life Savers Corp.*, 34 FTC 472 (1941); *see also FTC v. A. E. Staley Mfg. Co.*, 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945) (inclusion of unearned freight charges constitutes violation of Section 2(a)). The focus in those and similar cases is upon the price charged and the effect of discriminatorily assessed delivery charges, a concern undoubtedly more clearly within the reach of the statutory prohibition. *See American Can Co. v. Russellville Canning Co.*, 191 F.2d 38, 56 (8th Cir. 1951) (allowance of 45¢ per thousand cans delivered to plaintiff constituted claim of price discrimination, not of discrimination in services and facilities); *Sano Petroleum Corp. v. American Oil Co.*, 187 F.Supp. 345, 356 (E.D.N.Y.1960).

Without resolving the debate over the effect of *Kirby* and *Harper Plastics* on *Centex*, this Court concludes that the legislative history and treatment of the statute in caselaw suggests that Section 2(d) and 2(e) were intended to apply to promotional and advertising allowances and similar services, the cost of which, if shifted by a powerful buyer or seller, would result in a benefit akin to indirect price discrimination. *See* House Report at 15–16. While I cannot reject the logic of Plaintiff's argument that increased costs due to delivery delays affect price on resale, neither can I conclude that the alleged delayed delivery here constitutes a "service or facility" within 15 U.S.C. § 13(d) or 13(e). There is much merit to Defendant's contention that allegations of preferential delivery, if cognizable under Robinson-Patman, would conceivably swallow much of contract law, and Plaintiff has not presented any persuasive reason for including such allegations within the reach of this provision of antitrust law. One court, although finding it unnecessary to rule on the contention due to insufficient factual basis for the damages asserted, has agreed with Defendant's position advanced here:

The defendant asserts that these claims [under Robinson-Patman] for loss of profits on account of delayed deliveries, allegedly due to the failure of the defendant to comply with its contract "letter for letter," are nothing more than common law claims for alleged breaches of contract, which could not, in any event, be made a basis for treble damages under the Clayton Act. There is much force in that contention, but we think it unnecessary to rule upon the question.

*American Can Co. v. Russellville Canning Co.*, 191 F.2d 38, 55 (8th Cir. 1951), *rev'g* 87 F.Supp. 484 (W.D.Ark.1949). This Court agrees with the Defendant's asserted position and accordingly concludes that a claim of preferential and discriminatory delivery does not constitute a "service or facility" and cannot, as a matter of law, sound in 15 U.S.C. § 13(d) or 13(e).

Plaintiff contends that even if discriminatory delivery does not constitute a "service or facility" under Sections 2(d) or 2(e), such practices do constitute a violation of subsection 2(a) as indirect price discrimination. Plaintiff argues that timely delivery of a product is a "collateral privilege" which, if withheld in discriminatory fashion, could result in indirect price discrimination actionable under Section 2(a). Citing broad language in several decisions explaining "indirect price discrimination" as providing "something of value" on a preferential basis, Plaintiff contends that the furnishing by Defendant of timely deliveries to Plaintiff's competitors, while withholding deliveries to Plaintiff, constitutes a violation of the Act where it operates to lessen competition. *See Ludwig v. American Greeting Corp.*, 264 F.2d 286 (6th Cir. 1959); *Robbins Flooring, Inc. v. Federal Floors, Inc.*, 445 F.Supp. 4, 8 (E.D.Pa.1977); *Glowacki v. Borden, Inc.*, 420 F.Supp. 348, 356 (N.D.Ill. 1976).

While Sections 2(d) and 2(e) presume an anticompetitive effect from the violations enumerated, Section 2(a) requires a showing of such an effect if the alleged acts occurred. Thus, prosecution of a preferential delivery claim under Section 2(a) requires Plaintiff to demonstrate at trial the injury sustained as a result of the discrimination, something it would not be required to do if this Court's ruling had allowed the claim under Section 2(e).

The language of Section 2(a) is not infinitely elastic and in assessing Plaintiff's invitation to extend the statute to preferential deliveries, the Court is mindful that the various sections of Robinson-Patman ought properly to be construed "so as to produce a harmonious whole." 2A Sutherland, Statutes and Statutory Construction § 46.05 (C. Sands ed. 1973). The legislative history discussed above, as well as treatment of the statute by courts and commentators, indicate that the latter sections of the Robinson-Patman amendments were intended to prohibit means of discrimination not accomplished through price discrimination *per se*. *See* House Report, *supra*. A sense of the statute's whole purpose compels the conclusion that if preferential delivery does not constitute a violation of those latter sections intended to buttress the main price discrimination provision, it cannot logically be held to violate the main provision either. *See* House Report, *supra*, at 7.

At least one court has held that discrimination in time of delivery violates neither Section 2(a) nor 2(e). *ACS Enterprises, Inc. v. Sylvania Commercial Electronics*, 1979–2 Trade Cas. ¶ 62,765 (E.D.Pa.1979). The cases cited by Plaintiff, as with those cited under Section 2(e), concern discrimination in delivery-related items such as freight charges or delivery allowances that "amount in effect to a rebate." *See American Can Co., supra*, 191 F.2d at 56; *Glowacki v. Borden, Inc.*, 420 F.Supp. 348, 359 (N.D.Ill.1976); *see also Corn Products, supra*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320; *A. E. Staley Mfg, supra*, 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338. Those discriminatory devices more clearly result in price discrimination actionable under Section 2(a) and are of a qualitatively different nature from delayed deliveries which then reflect rising market prices.

Accordingly, the Court has concluded that preferential or discriminatory delivery of

goods violates neither Section 2(a) nor Section 2(d) of Robinson-Patman, and Defendant's motion with respect to such allegations is hereby GRANTED.

### 3. Illegal Brokerages

■ Plaintiff Howell alleges in its Complaint that Defendant transferred much of its steel to OMPC, its wholly-owned subsidiary, which was then able to sell the steel to competitors of Plaintiff, at prices higher than those paid by Plaintiff to Sharon and at prices higher than those Sharon could charge under federal price controls. Howell alleges that OMPC performed no services to which the higher price could justifiably be attributed. Howell alleges that Sharon handled all administrative services for OMPC and that OMPC performed no independent function other than to act as a "sham broker" in order to allow higher prices to be charged of those customers buying from OMPC. Therefore, Plaintiff alleges, the higher price charged by OMPC than that charged by Sharon constitutes an illegal brokerage in violation of Section 2(c). Specifically, Plaintiff alleges that Sharon diverted steel to its warehouse, OMPC, which could charge higher prices and earn a higher profit, thereby reducing the supply of steel that could be sold to purchasers such as Plaintiff which did not purchase through OMPC. The allegation is one of diminished supply and consequent need to cover at a higher price rather than one of price discrimination due to brokerage payments to more favored competitors. In fact, as Defendant points out, Plaintiff here purchased steel from Sharon at prices lower than those charged by OMPC and about which complaint is made.

Defendant moves for summary judgment on the Section 2(c) claim on the ground that, absent an allegation of disguised price discrimination, a claim of 2(c) violation cannot be sustained. Further, Defendant contends that any injury resulting from Defendant's pricing activity here is remote, indirect, and not of the sort intended to be prevented by the antitrust statutes.

Plaintiff responds to the motion by arguing that the prophylactic nature of the Robinson-Patman Act requires that the statute be broadly construed and that such a construction obviates the need to allege disguised price discrimination. Plaintiff contends that the caselaw has extended Section 2(c) to prohibit practices unrelated to price discrimination and that the existence of a "sham broker," allegedly utilized as a means of commanding higher prices in the marketplace, is sufficient to bring the complaint within the proper scope of Section 2(c).

The question was extensively briefed and ably argued by counsel and presents an issue not squarely confronted in this circuit.

Plaintiff's threshold contention here is that the clear import of Section 2(c), construed broadly, allows claims without reference to allegations of price discrimination. An examination of the pertinent authorities, however, convinces me that, although the statute was intended to remedy the creatively-designed schemes by which powerful retailers were coercing lower prices from suppliers, the section does not extend as far as Plaintiff would have it stretch. As noted earlier in this opinion, the Robinson-Patman Act must be construed as a harmonious whole, and the latter sections, while having independent significance in their specific provisions, address various practices resorted to as a means of avoiding the broad price discrimination prohibitions. *See* House Report, *supra*, at 15–16. The caselaw applying Section 2(c) has noted this fact and has construed the section to include an element of disguised price discrimination. The Supreme Court in *FTC v. Broch & Co.*, 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960), stated that the sections were intended to prohibit those practices by which large buyers gained "indirect price concession[s]" and that Section 2(c) was phrased broadly "to cover . . . all other means by which brokerage could be used to effect *price discrimination.*" *Id.* 169, 80 S.Ct. at 1160 (emphasis added, footnote omitted). While Plaintiff may be correct in its assertion that *Broch* discussed indirect price discrimination only because it did not

happen to involve a non-price discrimination brokerage claim, as in the case here, I cannot say as a matter of law that Section 2(c) is unrelated to disguised price discrimination.

A more recent case supports this conclusion. The First Circuit in *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir. 1981), held that a Section 2(c) claim cannot stand without a showing that the brokerage scheme was designed to "give the favored customer a competitive advantage through a lower price." *Id.* Citing *Broch*, the First Circuit noted that Section 2(c) "is designed to prevent violation of the basic § 2(a) price discrimination prohibition under different guise." *Id.* *See also Thomasville Chair Co. v. FTC*, 306 F.2d 541, 545 (5th Cir. 1962); *Robinson v. Stanley Home Prods, Inc.*, 272 F.2d 601 (1st Cir. 1959).

In contending that no disguised or indirect price discrimination need be alleged under Section 2(c), Plaintiff cites two cases. *Allgair v. Glenmore Distilleries Co.*, 91 F.Supp. 93 (S.D.N.Y.1950) (Kaufman, J.), is distinguishable and not helpful here. The case concerns the applicability of the *in pari delicto* defense to Section 2(c) actions, and although Judge Kaufman did discuss the plaintiff's allegation that the transaction in question was designed to evade federal price regulations, that discussion appears to have been intended to caution plaintiff from conceding too easily the propriety of the venture. Calling it "a very questionable transaction," the Court left the issue of the relationship between evasion of price controls and the prohibitions of the antitrust statutes to the trial court. Thus the applicability of Section 2(c) to a system allegedly designed to avoid federal price regulations was not addressed in *Allgair.*

The second case upon which Plaintiff relies is *Fitch v. Kentucky Light & Power Co.*, 136 F.2d 12 (6th Cir. 1943), in which a commercial bribery situation was held to be within the scope of Section 2(c). In *Fitch*, the former president of the Kentucky Light & Power Co. was sued by the company for having accepted bribes from a coal company and having bought all the coal required by the power company from the bribing coal company. The Sixth Circuit held that this arrangement constituted an actionable practice under Section (c), as it lessened competition by making it "practically impossible for any other company to sell coal" to the power company in light of the former president's motive and arrangement to buy only from the bribing coal company.

The cases presented by the parties and those examined by the Court do not satisfactorily explain the significance of *Fitch* and other commercial bribery cases in light of the holding of *Broch*. Defendant has posited that cases involving a breach of fiduciary duty, as involved in *Fitch* and other bribery situations, are sufficiently within the ambit of Section 2(c) as amplified by the legislative history and that to protect fiduciary relationships by the reach of that section is consistent with that statute's purpose. Defendant urges, however, that although the commercial bribery cases may not include allegations of price discrimination, the instant litigation does not come within the bribery exception and cannot logically be made to fit within the reasoning of those cases. Regardless of the explanation for the *Fitch* holding and recognizing that the case is Sixth Circuit precedent, I am not persuaded that the instant fact situation is similar enough to that of *Fitch* to warrant departing from the clear language of *Broch*. If this were a prototypic commercial bribery situation akin to *Fitch*, the case would be bound by that decision. Here, however, Plaintiff is asking the Court to extend the provisions of Section 2(c) to a situation more like a "naked" price differential, intended to be remedied by Section 2(a), *see* H.R.Rep.No. 2966, 84th Cong., 2d Sess. 97–98 (1956), than like an indirect price discrimination or commercial bribery circumstance in which "anticompetitive practices and effects are hard to identify," *Lupia v. Stella D'Oro Bisquit Co.*, 586 F.2d 1163, 1170 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). Absent clearer authority from this circuit that at least indirect price discrimination is not required

under Section 2(c), and in light of the reasoning of *Broch* and *Allen Pen*, I cannot conclude that Plaintiff's allegations under Section 2(c) are sufficient to withstand Defendant's motion.

In addition, Plaintiff's claim of sham brokerage by Sharon does not allege an injury of the type intended to be prevented by the Robinson-Patman Act. Plaintiff's brokerage claim in essence contends that Sharon diverted its steel to OMPC in order to command higher prices, thereby reducing the supply of steel available to Howell and increasing Howell's costs of production. Howell, however, had the benefit of lower steel prices on purchases from Sharon than did Howell's competitors which bought from OMPC at the higher rates.

Section 2(c) was intended to prohibit disguised price concessions that take the form of phony brokerage payments or discounts in lieu of brokerage. The provision was designed to prohibit specific practices that conceal anticompetitive effect. *See Lupia v. Stella D'Oro Bisquit Co., supra*, 586 F.2d at 1170. For that reason, the statute accords to those specific practices the *per se* inference of anticompetitive effect. Notwithstanding that inference, however, in order to recover treble damages in antitrust a private plaintiff must show "actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (U.S.S.Ct.1981). Those laws have as their purpose " 'the protection of *competition*, not *competitors*,' " *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)) (emphasis in original), and the allegation by Plaintiff that Defendant diverted its steel and thereby diminished Plaintiff's supply is not a claim of injury to competition remediable by the federal antitrust laws. While a claim of diversion of product to a subsidiary to evade federal price controls may state a cause of action of some form, the circumstances alleged here point neither to illegal brokerage nor to anticompetitive effect. Accordingly, Defendant's motion for summary judgment with respect to Section 2(c) claims is hereby GRANTED.

Finally, it should be noted that although summary judgment may be inappropriate in complex antitrust cases where motive and intent are crucial issues, summary judgment is proper for cases in which, as here, the inquiry is whether the plaintiff's claim alleges "facts demonstrating a violation that 'fits' within the requirements for an antitrust recovery, a question of law that can be answered by the court." *Lupia v. Stella D'Oro Bisquit Co., supra*, 586 F.2d at 1166. The instant motion, confined as it is to an application of antitrust caselaw to the allegations as pleaded and not requiring any consideration of motive or intent, is an appropriate device for determination of the sufficiency of those claims as a matter of law.

Accordingly, Defendant's Motions for Summary Judgment, filed on April 19, 1980, and August 10, 1981, are hereby GRANTED.

IT IS SO ORDERED.